STEELE v. STEELE, et al., Appellants.

Division One, March 29, 1901.

1. **Adopted Child:** INHERITANCE. An adopted child is the heir of his foster father, and will inherit his estate in case he dies intestate. But he may by will be disinherited, just as the children of natural parents may be. The mere proof by plaintiff that he was legally adopted by decedent as his child, establishes no right in him to inherit decedent's estate which he has otherwise disposed of by will. So that, in order for such adopted child to share in decedent's estate in spite of the will, he must show that there was a contract with testator to give him his property at his death.

3. ————: CONTRACT MADE IN ANOTHER STATE. The common law did not provide for the adoption of a child, and where neither the petition nor evidence shows any statute of the State where the contract is alleged to have been made, the court will not take judicial cognizance that there was any such statute.

4. ————: ORAL CONTRACT: LACK OF PROOF. The plaintiff when five years old was an inmate of an orphan's asylum in Chicago. The testator then resided in Wisconsin, and through the friendly offices of two women, plaintiff was placed in his charge. One of the women, his neighbor, wrote to the other who resided near the asylum, to get a little boy for testator, and she called on the manager of the asylum, and the boy was given to her to be sent to testator, the only assurance the manager requiring being that the boy was to have a good Christian home, and this being given, she sent him by railroad to testator's station. Whether either of his parents was then living or not was not shown. Two witnesses testified that testator stated in a casual conversation, that he had taken the child to rear as his own, and to be the heir to his property. This conversation took place thirty years prior to the trial, and one of the witnesses was at the time twelve years old, the other's age not shown. Another witness testified that in after years in urging the boy to work he stated, "You know when I am dead and gone whatever I have will be yours." Two other witnesses testified that he said to them that at his death his property would go to his wife and the boy. *Held,* that the con-

tract that the boy was to share testator's property was not established, and the special finding of the jury that there was such a contract had no foundation in the evidence to rest upon, and hence the judgment must be reversed.

Appeal from Knox Circuit Court.—*Hon. E. R. McKee,* Judge.

REVERSED AND REMANDED *(with directions).*

*L. F. Cottey, F. J. O'Reilly* and *J. W. Ennis* for appellants.

(1) The petition alleges a contract was made by William Steele with Mrs. McCabe for the benefit of plaintiff. The decree finds there was no contract made with Mrs. McCabe, but that William Steele did make such a contract with the plaintiff. A decree in equity must be founded upon facts embraced within the pleadings. The court could not base a decree on a state of facts not set up in the pleadings. Newham v. Kenton, 79 Mo. 382; Ross v. Ross, 81 Mo. 84; Paddock v. Lance, 94 Mo. 283; Reed v. Bott, 100 Mo. 62; Bank v. Rhorer, 138 Mo. 369; Joyce v. Growney, 154 Mo. 262; Black on Judgments, sec. 141. (2) The burden is upon the plaintiff to establish the agreement as alleged in the petition, by testimony that is so clear, cogent and unequivocal in all its terms, as to leave no room for reasonable doubt in the mind of the court. Sitton v. Shipp, 65 Mo. 303; Berry v. Hartzell, 91 Mo. 16; Railroad v. McCarty, 97 Mo. 222; Brownlee v. Fenwick, 103 Mo. 427; Rogers v. Wolf, 104 Mo. 9; Taylor v. Von Schraeder, 107 Mo. 226; Cherbonnier v. Cherbonnier, 108 Mo. 264; Teats v. Flanders, 118 Mo. 669; Alexander v. Alexander, 150 Mo. 597. (3) In this case there is a total failure of evidence to establish the contract alleged in the petition. Under the practice in this State, equity cases have been practically triable *de novo* in the

appellate court. This being an equity case, this court must weigh the evidence to find the facts. Benne v. Schnecko, 100 Mo. 258; Blount v. Spratt, 113 Mo. 54; Dalrymple v. Craig, 149 Mo. 351; Alexander v. Alexander, 150 Mo. 598. (4) Evidence of declarations of persons since deceased, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted. This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight. Johnson v. Quarles, 46 Mo. 427; Ringo v. Richardson, 53 Mo. 395; Cornet v. Bertelsmann, 61 Mo. 127; Davis v. Greene, 102 Mo. 184; Fanning v. Doan, 139 Mo. 411.

*G. R. Balthrope, F. H. McCullough* and *C. D. Stewart* for respondent.

(1) The petition alleges for cause of this action that decedent Steele contracted and agreed to adopt plaintiff as his son and heir, who should inherit all his property at his death. This contract is the gist and foundation of plaintiff's claim, and the evidence clearly and unequivocally shows that decedent took plaintiff when he was but a child and immediately changed his name to that of his own, and always thereafter recognized him as his son and heir who was to inherit all his property. The trial court properly found that, although the contract might not have been made with Mrs. McCabe, yet the evidence was so clear and convincing in its character as to exclude every reasonable doubt that such agreement was not made with plaintiff and often reaffirmed to him by decedent; and the evidence having further disclosed the uncontroverted fact, that decedent just prior to his decease and prior to the making of the "will" of record had made another and different will in which he had devised all his property to plaintiff and decedent's wife Cather-

ine, and the evidence having further shown to the exclusion of every doubt that plaintiff had from the very moment of his first entering into decedent's family up to the time of the death of said decedent, performed every duty resting upon him by virtue of such agreement to the full and complete satisfaction of decedent with the understanding always that he was to so receive decedent's property at his death, we think this evidence clearly brings this case within the rules laid down by this court in Wright v. Tinsley, 30 Mo. 387; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 661; Nowack v. Berger, 133 Mo. 24; Alexander v. Alexander, 150 Mo. 379; Van Duyne v. Vreeland, 11 N. J. Eq. 370; Van Duyne v. Vreeland, 12 N. J. Eq. 142; Godine v. Kidd, 19 N. Y. 335.    (2) Where the evidence consists of oral testimony, the trial court's finding of facts will be greatly deferred to, on account of the superior advantages possessed by the trial court for weighing the evidence and judging of the credibility of the witnesses.    Hartley v. Hartley, 143 Mo. 216; Mathias v. O'Neill, 94 Mo. 520; Loring v. Atterbury, 138 Mo. 262; Shanklin v. McCracken, 151 Mo. 587; Parker v. Roberts, 116 Mo. 667; Chouteau v. Allen, 70 Mo. 336; Sharp v. McPike, 62 Mo. 307; Lins v. Lenhardt, 127 Mo. 281; Short v. Taylor, 137 Mo. 517; Erskine v. Lowenstein, 82 Mo. 301.

VALLIANT, J.—This is a suit in equity for the enforcement against the executors and legatees under the will of William Steele, deceased, an alleged oral agreement to adopt the plaintiff and leave him all the property which the testator should own at his death.

The petition alleges that in 1868, the plaintiff, whose name was Walter McAvilly, about five years old, was in a Catholic orphan asylum in Chicago, and under the particular

charge and care of Mrs. Dennis McCabe. That the testator, William Steele, then living with his wife Catherine on a farm in Wisconsin, was childless, and desiring a child to adopt, entered into a contract with Mrs. McCabe that he would take the plaintiff to his home as his own child, the plaintiff to serve him as such; that he would legally adopt him, and at his death the plaintiff should inherit all his property. That under that agreement Mrs. McCabe delivered plaintiff to testator, who took him into his family, changed his name to George W. Steele, and they immediately entered upon the reciprocal relation of parents and child, performing their respective duties pertaining to that relation, which continued until plaintiff was grown; that in 1872, William Steele with his family, including the plaintiff, moved to Knox county, Missouri, where he lived until his death; that when plaintiff was twenty-three years old, with the advice and approval of the testator, he went to California, where he was residing at testator's death, but while there he kept a filial correspondence with his adopted father. The allegations to the agreement to adopt and leave the property to plaintiff were denied in the several answers filed. Those were the only issues of fact in the case.

Plaintiff read in evidence the deposition of Henry Harm and August Harm, taken in Wisconsin, who lived in the neighborhood where Steele had lived in that State, and remembered when he brought the plaintiff to his home there. These two witnesses testified to a conversation they had with William Steele in relation to the matter thirty years before. The age of one of these witnesses is not given, but that of the other is stated at forty-two when the deposition was given, so that he was a boy twelve years old when Mr. Steele was holding this conversation with them.

Henry Harm's recollection of this conversation was: "He told me he took that boy for his own boy and when he died he

would get the property.... Q. Did he say to you what he would do for him at his death? A. He would give him his property." On cross-examination: "Q. Did William Steele say anything to you about any contract under which he took the plaintiff? A. No."

August Harm, having first stated that Mr. Steele told him the conditions on which he had taken plaintiff, was asked: "Q. What were the conditions? A. He took Walter to raise him and bring him up as his own boy, and after his death should be heir to his property. Q. Did you hear William Steele say that he would leave plaintiff his property at his death? A. Yes, sir. .... William Steele told me that he had adopted the boy as his own, to bring him up as his own child and to be heir to his property at his death." Cross-examination: .... "Did William Steele say anything to you about any contract under which he took the plaintiff into his family? A. No, sir.

Isaac Brown testified that about 1891 or 1892 he paid Mr. Steele $324 that he owed him, and when he did so Steele said: "I'll just lay that aside for my boy." Plaintiff was then in California. ·

Mr. Stewart testified that in 1886 or 1887 Mr. Steele approached him on the subject of buying an interest in witness's hardware business for George, the plaintiff, saying that his principal reason was he wanted to keep George at home with him.

Patsy Collins testified that when he was a boy and with other boys of George's age on Saturdays would try to entice him away from his work to read dime novels, the old man would reprimand George, and once he heard him say to George, that "he ought to take care of his work a little closer, and not be losing your time with these boys, because you are not working for me, you are working for yourself; you know when I am dead and gone, whatever I have got will be yours."

Mr. Jarvis testified that he had a conversation with Mr. Steele about George, some time after he had gone to California, and suggested to him that he ought to "assist the boy some," to which Steele replied, "Well, yes, I will, I have done it, I have assited him heretofore some, not to the extent I calculate to if he conducts himself right."

Mr. Randolph testified that he went one day to pay the old man $100 which he owed him and found him at work in the garden, told him he ought not to work when he had so much money, asked him what he was going to do with his money, he could not carry it with him: "Oh, well," he says, "I am keeping it for George and Kate." Kate was his wife.

Mr. Pardon testified that speaking of doing his work himself instead of having witness do it, he said: "I ain't really able to do it, but I have to do it . . . . I would rather take things a little easier. At my death it all goes to George, I suppose, and the woman."

Judge Hunott testified that Mr. Steele told him when George was in California that if he would come back he would set him up in business. There was testimony of other witnesses tending to show that Mr. Steele treated George and spoke of him as a father would his son, and while he was living with him collected some wages that were due him for work; that he was treated to all appearances as a son of Mr. Steele, and bore himself towards Mr. Steele as is usual for a son.

On the part of defendants the testimony was to the effect that in 1867, Mrs. McCabe, the person named in the petition as the one with whom the contract was made, then living in Chicago, made a visit to Mrs. Keenan, with whom she was related by marriage and who was a sister of Mrs. Steele, and resided in the same county in Wisconsin in which the Steeles resided. On that visit Mrs. McCabe made the acquaintance of Mrs. Steele. Shortly after her return to Chicago Mrs. McCabe

received a letter from Mrs. Keenan asking her if she could get a little boy for Mrs. Steele in some orphan asylum in Chicago. The result of it was that after some ineffectual efforts to find such a boy Mrs. McCabe called at the orphans' asylum of the Christian Brothers in Chicago, and this boy was given to her to be sent to Mrs. Steele. The only assurance the Brothers required was that the child was to have a good home with Christian people, and they accepted Mrs. McCabe's assurance on those points. Mrs. McCabe then took the child to the railroad, placed him in charge of a conductor whom she knew, with directions to put him off at Fox River Station in Wisconsin, where Mr. Steele was to meet him, and where Mr. Steele did meet him and take him home.

That is substantially the evidence in the case. The chancellor took the advice of a jury on the questions of fact. The jury made specific findings: That William Steele contracted with Mrs. McCabe to take plaintiff into his home as his own child and legally adopt him as such and that plaintiff should receive and inherit all decedent's property at his death; that in pursuance of that agreement Steele took the plaintiff home and kept him with the full understanding that he was to have all decedent's property at his death; that plaintiff, understanding the agreement and in pursuance thereof, entered the home of William Steele and conducted himself towards him as a dutiful son up to the time of his death. The court adopted the finding of the jury as its own except that it found that the contract was not made with Mrs. McCabe, but was made with the plaintiff himself, and decreed accordingly, from which decree the executor and legatees have appealed.

The plaintiff's proposition is not merely that Mr. Steele contracted to adopt him, but also that he agreed to leave him all his estate at his death. An adopted child, in respect of his right of inheritance, is upon an equality with a real child; he

will inherit in case his adopted parent dies intestate, but as a father may by his will give his property even to a stranger to the exclusion of his own son, so may an adopting father defeat the expectation of his adopted son.   The latter stands in no better condition than the real son.   In the case at bar, even if it be conceded that the plaintiff was the adopted son of William Steele, the concession would avail him nothing because William Steele has made testamentary disposition of his estate giving to the planitiff only a nominal legacy.   Therefore, the plaintiff to establish his case must show, not only that he is entitled, by the alleged contract of adoption, to the position of heir, but also that being more favored than an own child, he could not be disinherited by will.   That is an advanced position for one to take; although not altogether untenable, strong proof is required to maintain it.

It is not certain from the plaintiff's pleading and evidence, where he lays, as it were, the venue of his contract, whether in Illinois or Wisconsin, but the contract was made, according to his theory, before he came to Missouri.   The common law did not provide for the adoption of a child, and if there is any statute either in Illinois or Wisconsin on the subject, it was not pleaded or shown in evidence, and we can not take judicial cognizance of it; we only know that the common law prevails generally in those States.   The Steele family was living in Wisconsin at the time the plaintiff was received into it, and continued to reside there for six years thereafter.   The plaintiff's status was fixed in the family before he came to this State, and is really to be judged by the laws of the State where it became fixed.   The testimony of the two Harms comes nearer tending to prove the agreement alleged in the petition than that of any other witness, and according to that the agreement had already been made when they were residing in Wisconsin.

But let us for the argument's sake assume that the laws of

Illinois and Wisconsin are in this respect like our own, and that an oral contract to adopt a child may, when it has been performed on the child's· part, and an oral contract to give the adopted child the adopting parent's estate at his death may, when the child's part has been performed, be enforced in accordance with the equitable principles laid down in Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Teats v. Flanders, 118 Mo. 660; Nowack v. Berger, 133 Mo. 24; Alexander v. Alexander, 150 Mo. 579; still the plaintiff must fail in this case, for the almost total absence of proof.

The plaintiff at the time of the making of the alleged contract was a young child in an orphan asylum. Whether his parents were, or either of them was living, we do not know. There was no one purporting to stand *in loco parentis* to him unless it was the manager of the Christian Brothers Asylum, and the only condition he imposed was that the child should be given a good home with Christian people; that condition was promised and was fulfilled. In removing him from the asylum no natural ties were severed; it was only a change from one home among strangers to another.

The learned counsel for the plaintiff have the right conception of the law and state it with clearness in their brief: "We are aware of the fact that in the trial of this case the burden rested on the plaintiff and it was his duty to present to the chancellor evidence so strong, cogent and convincing as to remove and exclude every doubt that decedent made the contract; but such evidence may consist in the declaration and acts of decedent, with their attending circumstances."

Giving to every particle of plaintiff's evidence full credence, it goes no further than to show that William Steele took the plaintiff into his family, reared him as a son, re-

ceived from him a son's duty and from time to time made statements indicating that he intended to leave him his property at his death. But that he had ever bound himself so as to impair his own right to will his estate as he might thereafter see fit, there is not a word of evidence.

But all the plaintiff's evidence is not entitled to be received with absolute confidence. As above said the testimony of the two Harms comes nearer tending to prove the plaintiff's theory than any other, and that testimony stands on a very unsatisfactory foundation.

It was a repetition of a casual conversation alleged to have occurred over thirty years before, when one of the witnesses was twelve years old (the age of the other is not given), the conversation of a middle aged man with a school boy. But taken at its face value and analyzed, it amounts to nothing more than the expression of an expectation. Both witnesses said that he never said anything in relation to having made a contract to that effect. Whilst the testimony for the plaintiff did not tend to show that there was such a contract, the testimony for the defendants showed beyond doubt that there was no such contract.

The special findings of the jury have no foundation in the evidence to rest upon.

The judgment is reversed and the cause remanded to the circuit court with directions to enter judgment for defendants dismissing the plaintiff's bill.

All concur, except *Marshall, J.,* absent.